UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARCIA CHACÓN; WILFRIDO MATUTE; Fr. JAMES MANSHIP; SEGUNDO AGUAYZA; JOSÉ LUIS ALBARRACÍN; WELINTON SALINAS; JOHN ESPINOSA; GUIDO XAVIER CRIOLLO; EDGAR TORRES; and YADANNY GARCÍA; | : : : : : : : : : | |
| Plaintiffs, | : : | |
| VS. | : : | Civil Action No.: |
| EAST HAVEN POLICE DEPARTMENT; TOWN OF EAST HAVEN, CHIEF LEONARD GALLO, individually and in his official capacity; OFFICER DENNIS SPAULDING, individually and in his official capacity; OFFICER DAVID CARI, individually and in his official capacity; OFFICER JASON ZULLO, individually and in his official capacity; OFFICER VINCENT FERRARA, individually and in his official capacity; OFFICER DAVID OLSON, individually and in his official capacity; SERGEANT FRANK MONTAGNA, individually and in his official capacity; SERGEANT EDWARD LENNON, individually and in his official capacity; OFFICER MICHAEL SORBO, individually and in his official capacity; OFFICER CHERYL CONYERS, individually and in her official capacity; JOHN DOES 1 - 10, individually and in their official capacity, | : : : : : : : : : : : : : : : : : : : : : : | |
| Defendants. | : | October 26, 2010 |

1

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

### Introduction

1.      The Town of East Haven and its police department have engaged in a campaign of racial profiling against Latino men and women, singling them out for harassment and worse, and then retaliating against those who dared to oppose or even investigate their misconduct.  This is an action to enforce the rights of the targets of that campaign. As this complaint details, the profiling has included not only hundreds of traffic stops but also more aggressive and violent conduct such as beatings, use of Tasers, false and illegal arrests, conspicuous shows of force designed to disrupt commerce, and even raids of legitimate business, all for the purpose of intimidating the Latino community.  These practices have continued for years without the Town or Police Department acting to check them; just the reverse, the Town and Police Department have promoted continued profiling and have refused to adopt even basic policies – used by police departments large and small throughout the nation –  necessary to assure evenhanded law enforcement. Plaintiffs are only a few of the many victims of this campaign.  They seek damages for their individual injuries and injunctive relief to require the Town and the Police Department to stop the profiling campaign and to comply with basic principles of American law enforcement that they have systematically ignored for years.

### Jurisdiction and Venue

2.      Plaintiffs bring this case pursuant to the First, Fourth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, *et seq*., and the Constitution and laws of the State of Connecticut. Jurisdiction is conferred on this court by 28 U.S.C. §§ 1331 and 1343 and  42

2

U.S.C. § 1983; supplemental jurisdiction over the state law claims is conferred by 28 U.S.C. § 1367.

## Parties

3.     Plaintiffs Marcia Chacón, Wilfrido Matute, José Luis Albarracín, Welinton Salinas, John Espinosa, Guido Xavier Criollo, Yadanny García, Segundo Aguayza, and Edgar Torres are Latinos whom the defendants targeted on account of their race and ethnicity.  Plaintiff Fr. James Manship, a Roman Catholic priest, was targeted by Defendants because of his advocacy on behalf of Latinos in East Haven.

4.     At all times relevant to this complaint, all the individual defendants were sworn members of the East Haven Police Department.

5.     Defendant Leonard Gallo was the Chief of the Department. As such, he was at all times relevant to this complaint the administrative head of the Department, responsible for administering, coordinating and controlling the operations of the Department and for the overall supervision and direction of all its activities.  Chief Gallo was specifically responsible, either directly or in a supervisory capacity, for: (a) the supervision, training, discipline and control of persons working for the Department, including the other individual defendants; (b) the establishment and enforcement of policies and practices concerning the fair and equal treatment of all members of the public; and (c) ensuring in particular that the Department's conduct was free from discrimination or profiling based on race or ethnicity.

6.     At all times relevant to this complaint, defendants Frank Montagna and Edward Lennon were sergeants in the Department. As such, they were responsible not only for complying with the law but also for (a) the supervision and control of officers under their

3

command, including other defendants; (b) the enforcement of policies and practices concerning

the fair and equal treatment of all members of the public; and (c) ensuring in particular that the

conduct of officers under their command was free from discrimination or profiling based on race

or ethnicity.

7.      Defendants Dennis Spaulding, Jason Zullo, David Cari, Vincent Ferrara, David

Olson, Michael Sorbo, and Does 1 - 10 were sworn members of the East Haven Police

Department.

8.      The true names and capacities of Defendants Does 1 - 10  are presently unknown

to Plaintiffs.  Plaintiffs therefore sue Defendants Does 1 - 10 by fictitious names and will seek

leave to amend this complaint to add their true names and capacities.

9.      Defendant Town of East Haven ("the Town") is a Connecticut municipality

organized under the laws of the State of Connecticut. At all relevant times, it employed,

supervised, and directed the conduct of individual defendants.

10.      Defendant East Haven Police Department ("the Department") employs and is

responsible for the conduct of all the individual defendants. It has been and is now a recipient of

financial assistance from the federal government, and is therefore subject to the

nondiscrimination requirements of Title VI of the Civil Rights Act of 1964 ("Title VI").

11.      At all times relevant to this complaint, each of the individual defendants was

acting in the course and scope of his employment with the Town and under color of law.

## FACTS

### Overview - East Haven's Police Department Is in a Shambles

12.      East Haven is a town bordering a city, New Haven, which has a large Latino and

4

African-American population. East Haven itself has a much lower proportion of minority residents, and it has a history of violent, race-based lawlessness directed at racial minorities. In a case that is still pending, the Town has been held liable for a policy and custom of deliberate indifference to the rights of people of color that led to the fatal police shooting of an African-American man named Malik Jones near East Haven's border with New Haven. More recently, East Haven's Latino population has begun to grow, sparking resentment and lawlessness in its police department.

13.    In response to the legal finding more than seven years ago that the Department's own policy and custom caused the death of an African-American man on the basis of his race, the Town did nothing to reform the Department. On the contrary, as the Latino population of East Haven has grown, that community has become a focus of police profiling. The United States Department of Justice is conducting an investigation into racial profiling of Latinos and has now notified the Town that the Department is in a shambles, with no modern rules of conduct for officers, no check on their use of force, inadequate training, and no functioning citizen complaint system.

### Statistical Evidence of Large Scale Racial Profiling

14.    A review of traffic stops points to both wholesale racial profiling and either an equally widespread effort to cover it up or a complete breakdown of systems for preventing the practice. A review of the 376 tickets issued on Route 80 and Main Street in East Haven between June 1, 2008 and February 28, 2009 shows that while Latinos constitute just six percent of all East Haven residents, nearly 60 percent of tickets were issued to drivers with Hispanic names. This difference of more than 50 percentage points between the number of presumptively Latino

drivers being stopped and their representation in the East Haven population is well outside the five-point rate of disproportionality considered acceptable by Connecticut's Chief State's Attorney.

15.     Connecticut has laws designed to identify and deter racial profiling.  Since the year 2000, the Connecticut legislature has imposed reporting requirements in order to combat racial profiling and pretextual traffic stops. Police departments are required by state law to submit reports to the Chief State's Attorney, who in turn must provide a report to the Governor and General Assembly to ensure that law enforcement agencies are proactively monitoring the activities of individual officers in order to guard against the possibility that enforcement decisions are being based on race or ethnicity.

16.     The Town and the Police Department have systematically violated that law in order to mask the racial profiling that the law was designed to detect.  While nearly 60 percent of the group of 376 tickets referred to in paragraph 14 above were given to persons with Hispanic names, the Department recorded that fewer than five percent of those persons were Hispanic.

### "They Can Park in New Haven and Walk"

17.     Plaintiffs Wilfrido Matute and Marcia Chacón own My Country Store, a small grocery on Main Street in East Haven.  They started the store in 1999 with their life savings. Since the store opened for business they have each worked approximately 80-90 hours per week in the store.  The store primarily serves the Latino community of East Haven and New Haven. Like such small local stores everywhere, it is not only a commercial establishment but also a neighborhood center where people talk and visit.  It is an important institution in the Latino community.

6

18.     In or around early September 2008, defendant Spaulding began parking outside My Country Store and stopping Latino customers, ticketing Latino customers, and removing license plates from cars belonging to Latino customers.

19.     Shortly thereafter, plaintiff Matute spoke to Officer Spaulding, telling him that the conduct described above was driving away Latino would-be customers because people were afraid of being randomly stopped or detained while shopping.

20.     Spaulding told Mr. Matute that driving people away was just what he had in mind, telling them that he did not want Mr. Matute's customers parking at the store.  Instead, he said, "they can park in New Haven and walk."  The New Haven border is a mile away from My Country Store.

21.     Between September 2008 and the Summer of 2009, Spaulding staked out My Country store many times – stopping, harassing, and ticketing Latino drivers and customers in an effort to drive away Latino shoppers and destroy the Chacón-Matute family business.

### "I'll Tell You What I'm Going To Do with That Camera."

22.     Like many owners of small stores, plaintiffs Chacón and Matute put numerous old license plates on the back wall of their store as decoration.  On February 19, 2009, defendants Spaulding, Cari, and Does 1-3 entered the store.  With no warning or legitimate reason, and without a warrant or the consent of plaintiffs Chacón and Matute, they ordered Matute to remove all the license plates from the wall and subsequently confiscated them.

23.     Defendants Cari and Spaulding gave plaintiffs Chacón and Matute citations charging four counts of Failure to Return Cancelled or Abandoned plates, a misdemeanor offense.

7

24.     During the raid, plaintiff Fr. Manship received a phone call that members of the Police Department, including defendants Cari and Spaulding, were involved in some kind of incident at My Country Store.

25.     Fr. Manship went to the store with a video camera and began to film the defendants' activities.

26.     Defendant Cari asked Fr. Manship why he was filming. When Fr. Manship replied that he was taking a video of what was going on. Cari responded, "Well, I'll tell you what I'm going to do with that camera."

27.     The defendants then confiscated the camera and handcuffed and arrested Fr. Manship. They detained and interrogated him about his allegedly criminal conduct. They later charged him with Disorderly Conduct and Interfering with a Police Officer.

28.     As they were leaving the store, Defendants Spaulding, Cari, and Does 1-3 realized that their illegal activities had been recorded on the store's surveillance video. The defendants returned to My Country Store and, again with no warrant or consent from the store owners, rifled through the store's backroom office, searching for the surveillance camera footage.

29.     The defendants' plan failed, though not for lack of trying; they were unable to figure out how to remove or destroy the surveillance video, and in fact the video had captured their illegal activity.

30.     Defendant Cari then covered up the defendants' conduct. In the police report he filed about the incident, he wrote that he did not know that Fr. Manship had a camera. He even referred to the camera as an "unknown, shiny silver object," implying that he acted because the camera may have been a weapon. In fact, Cari knew perfectly well that the camera was a camera

8

and said so – on camera.

31.     The charges against plaintiffs Chacón and Matute were all nolled.

32.     The charges against Fr. Manship were all dismissed.

33.     Defendants' conduct toward plaintiff Fr. Manship described in paragraphs 26-30 above was intended to punish and deter his observing and reporting on their activities and his efforts to oppose official misconduct committed against the Latino community.  These activities are protected by the First and Fourteenth Amendments.

34.     As a result of Defendants' conduct, Fr. Manship suffered distress and anxiety, and he was forced to defend himself against baseless criminal charges.

35.     Shortly after the February 19 raid, Plaintiffs Chacón and Matute met with the press and federal investigators to tell them about what was happening to their business and specifically about the raid.

36.     After they did so, a group of East Haven police patrol cars spent hours one evening circling back and forth in front of the store.  Plaintiffs Matute and Chacón closed the store, went to their car, and pulled out onto the street.  Defendant Zullo immediately stopped and questioned them.  His reason for doing so was to intimidate them in retaliation for speaking out about the raid.

37.     The Defendants' conduct described in paragraphs 18-34 and 36 above was based on the race and ethnicity of plaintiffs Chacón and Matute and their customers.

38.     Shortly after the February 19 raid, defendant Gallo, the Town, and the Department were well aware of what had occurred and the unlawful and unconstitutional misconduct of defendants Spaulding, Cari, Zullo, and Does 1-3.   Nevertheless, they took no action to address

the defendants' misconduct or to prevent the recurrence of similar misconduct based on race and ethnicity.

39.     As a result of having their business targeted by this race-based harassment campaign, plaintiffs Chacón and Matute have been damaged; they have lost customers and revenue, and their store's ability to serve as a community destination has been harmed. They have also suffered emotional distress and anxiety about the threatened destruction of the family business they have worked years to build.

### "Too Many Immigrants Living Here Brings Down the Value of Houses."

40.     At all times relevant to this action, plaintiff Segundo Aguayza has owned a small multi-family house in East Haven.

41.     Aguayza lives on the first floor of that house with his wife and children, while renting out the two floors above.

42.     At all times relevant to this complaint, the tenants in the apartments were Latino.

43.     Between March 2008 and January 2009, East Haven police officers, including defendants Spaulding and Zullo, repeatedly came through the Aguayza family's front door, sometimes without even announcing their presence or asking permission to enter. They came during the day while plaintiff Aguayza was at work, demanding identification of whomever they could find at home. On each of these occasions, the officers entered without a warrant, the consent of the residents, or the presence of exigent circumstances.

44.     Spaulding and Zullo kept coming to the house in order to drive plaintiff Aguayza and his Latino tenants out of their house and out of town.

45.     The officers gave pretextual reasons for barging into the house, sometimes

10

claiming that the neighbors complained about noise from Mr. Aguayza's cocker spaniel, sometimes claiming that there were too many cars in the driveway. At no time did the officers display a warrant or secure the consent of the residents to search the home.

46.     During one of these illegal intrusions, one of the officers told plaintiff Aguayza's wife, in front of their children, to "go back to your country."

47.     Plaintiff Aguayza's family and tenants were frightened by these intrusions.

48.     On January 9, 2009, Defendant Spaulding drove his car into Mr. Aguayza's backyard, where other cars were parked. An animal control officer pulled up at the same time, purportedly because of the cocker spaniel.

49.     Defendant Spaulding told Mr. Aguayza that there were too many cars in the back yard and that they would be towed. He added that having too many immigrants living there brings down the value of the houses. On his way off the property at the end of the encounter, Spaulding told Mr. Aguayza to "get a lawyer."

50.     Despite Spaulding's threat, no tow trucks came to the property; the animal control officer did not issue a citation; and the cocker spaniel stayed quietly in the basement throughout the episode.

51.     The defendants' conduct described in paragraphs 43 - 49 above was based on the race and ethnicity of plaintiff Aguayza, his family, and his tenants.

52.     As a result of this harassment, Plaintiff Aguayza has suffered emotional distress, both on account of the defendants' treatment of him and because of his fear of what the defendants and other members of the Department might do to him or his wife and children.

11

### "F___ing Spanish"

53.     On January 21, 2009, at around 10:00 p.m., Plaintiffs John Espinoza, Welinton

Salinas, José Luis Albarracín, and Guido Xavier Criollo were traveling in Plaintiff Salinas' car to

get dinner at La Bamba Restaurant on Main Street in East Haven.

54.     The four drove down High Street and stopped at the intersection of Forbes Place

and Main for a red light.

55.     Defendant Spaulding was a well-known figure on Main Street, especially to

Latinos, and for good reason: among other actions, some of which are detailed in this complaint,

75 percent of Spaulding's citations during that January and February were given to people with

Hispanic names, in a town with a six-percent Latino population.

56.     A patrol car containing Spaulding and Defendant Doe 4 passed Plaintiffs

as they were stopped at the intersection, and Spaulding took a long look at Plaintiffs and

identified them as Latino.

57.     Plaintiffs' car signaled and turned onto Main Street toward the restaurant.

58.     Spaulding's patrol car then swerved, made a u-turn, and sped up to closely follow

Plaintiffs' car.

59.     When plaintiff Salinas, the driver, signaled and turned into the restaurant's parking

lot, Spaulding's patrol car switched on its lights and pulled up behind their parked car.

60.     Spaulding approached the car and asked plaintiff Salinas for a driver's license.

Plaintiff Salinas told Spaulding he didn't have a license.

61.     Plaintiff Criollo offered to show Spaulding his license.  Spaulding grabbed it,

exclaimed "F__ing Spanish," and threw the license back in Criollo's face.

62.    Another patrol car pulled up.  Defendant Doe 4 came out of the second car, banged on plaintiff Criollo's window, and told him to get out of the car.  Doe 4 frisked plaintiff Criollo, then took his license and threw it on the ground.

63.    When plaintiff Albarracín asked Doe 4 why he had thrown Criollo's license on the ground, Doe 4 responded by arresting Albarracín.

64.    Doe 4 told plaintiff Criollo to go home.  When Criollo told Doe 4 he wanted his license back and started searching on the ground for it, Doe 4 handcuffed and arrested him.  When Plaintiff Espinoza asked Doe 4 why he had arrested Criollo, Spaulding and Doe 4 arrested him.  Plaintiff Salinas said nothing, but Spaulding and Doe 4 arrested him anyway.

### "But Who Saw You Get Hit?"

65.    Defendants Does 5 and 6 drove plaintiff Criollo to the police station.  When Criollo asked why he was arrested, Doe 5 sprayed him in the face with Cap-Stun, a Mace-like substance.  When they arrived at the police station, Doe 5 opened the back door and punched Criollo in the face.  Defendant Doe 5 continued to punch Criollo as he dragged him to the cell.  Does 6, 7, and 8 watched these attacks take place and could have intervened, but instead did nothing.

66.    Does 5, 6, 7, and 8 took Plaintiff Albarracín to a cell, separately from plaintiff Criollo.  Albarracín told the officers he did not understand why he had been arrested.  Doe 5, clutching Albarracín's hair and collar, hit Albarracín's head against the concrete wall twice.  When Albarracín fell to the floor and cried out for help, Doe 5 asked him if he was a baby.

67.    Defendant Doe 9 came into the room and told Doe 5 to stop what he was doing.  Doe 9 picked Albarracín up off the floor.  Albarracín told Doe 9 that Doe 5 had hit him and

13

thrown him against the wall.   Doe 9 replied "But who saw you get hit?" and  Doe 5 and Doe 9 laughed.

68.      Plaintiff Albarracín asked Defendant Doe 10 to send a doctor because his head hurt.  Doe 10 said "[a]migo, that is impossible."  When Albarracín asked why, Doe 10 responded, in effect, "because you're in jail."

69.      When Albarracín then grabbed the cell bars and called out that he wanted to see a doctor, Doe 5 turned off the light that illuminated Albarracín's cell, came toward him and gestured as if he was going to punch him. Doe 5 then grabbed the front of Albarracín's shirt and ripped it completely open, telling him to "shut the f___ up!"

70.      Soon thereafter, Spaulding entered the room, exclaimed loudly in broken Spanish, roughly, "Que bonita la siesta amigos tonight" [approximately translated:  "What a nice nap you are going to have tonight, my friends"], and laughed.

71.      Plaintiff Criollo, nose bleeding, was placed in a cell close enough to plaintiff Albarracín to hear the police beating Albarracín, to hear him calling on them to stop, and to hear Spaulding mock Albarracín in broken Spanish.

72.      Plaintiff Salinas was eventually placed in a cell at the police station after the police took his shoes and jacket.  Plaintiff Criollo was already there with a bloody nose.  Salinas also heard Albarracín's cries and Spaulding  mocking them.  Salinas feared he was next.

73.      Plaintiff Espinoza was also placed in a cell at the police station.  When Albarracín was crying for help, Espinoza saw Doe 5 move towards Albarracín's cell and turn off the lights. Espinoza then heard Spaulding mock them in broken Spanish.  Espinoza too feared he was next.

74.      Defendants' conduct, described above, was based on the race and ethnicity of

14

plaintiffs Albarracín, Criollo, Espinoza, and Salinas.

75.　　Plaintiffs were seriously injured, physically and emotionally, by Defendants' conduct.

### "Go Back to Your Country"

76.　　On March 1, 2009, plaintiff Edgar Torres was at Las Barras, a café in East Haven, after work.

77.　　Defendants Spaulding, Ferrara, Conyers, and Olson came into Las Barras and told everyone to leave.

78.　　Plaintiff Torres asked the police why everyone had to leave the bar.

79.　　Spaulding told Torres to "shut the f___ up."

80.　　When Torres asked Spaulding why Latinos are treated badly by the East Haven police, Spaulding called Torres a "f___ing wetback" and told Torres he should go back to his country.

81.　　Spaulding then handcuffed Torres and tasered him so that he fell to the floor. While Torres lay prostrate, Spaulding tasered him twice more and kicked him.

82.　　Defendants Ferrara, Conyers, and Olson stood by, doing nothing, although they could readily have prevented Spaulding from assaulting and injuring Torres.

83.　　Torres, in pain and mostly immobilized, rolled on the floor; Conyers then tasered him a fourth time.

84.　　Meanwhile, Spaulding, Ferrara, and Olson stood by, doing nothing, although they could readily have prevented Conyers from assaulting and injuring Torres.

85.　　Spaulding and the other officers put Torres in the patrol car. Torres told

15

Spaulding that he was going to tell others what Spaulding had done.  After the other officers had walked away from the vehicle, Spaulding warned Torres that Spaulding would kill him if Torres complained or told anyone what happened that night.

86.     Defendants' conduct, described above, was based on the race and ethnicity of plaintiff Torres.

87.     Plaintiff Torres was seriously injured, physically and emotionally, by Defendants' conduct.

### Four Officers, Three Taser Shots, and a Phantom Arrest

88.     On or about August 8, 2009, Plaintiff Yadanny García was riding as a passenger in a car driven by his cousin Edgar Perez. When they pulled over at a restaurant to use the bathroom, García encountered four defendants, who were about to do to him what other defendants had earlier done to Edgar Torres.

89.     García  went into the restaurant with Mr. Perez but then stepped outside to wait for him.  At that point, García saw Defendants Zullo, Montagna, Sorbo, and Lennon come running at him, yelling for him to get on the ground.

90.     García  put his hands on his head and started going down to the ground as instructed.  Defendant Zullo arrived first.  While García cried, "what are you doing?" defendant Zullo tasered him three times on the ground.

91.     Zullo then punched García multiple times, called him a "[f]___ing Ecuadorian," and told him to go back to his country.

92.     Defendants Montagna, Lennon, and Sorbo stood by, doing nothing, although they could readily have prevented Zullo from assaulting and injuring García .

16

93.     After being arrested and taken to the East Haven Police Department, García was taken to the hospital for treatment of the injuries that the defendants had inflicted.

94.     None of the defendants ever admitted arresting García. In fact, Zullo, Montagna and Lennon, under oath at a DMV hearing, all denied making the arrest.

95.     Defendants' conduct, described above, was based on the race and ethnicity of plaintiff García.

96.     Plaintiff García was seriously injured, physically and emotionally, by Defendants' conduct.

### "This Investigation is Going Nowhere."

97.     In response to the defendants' pattern of misconduct, and at the request of the Pastoral Council of St. Rose of Lima Church, the United States Department of Justice opened an investigation into the Department. The defendants are well aware that they are now under the scrutiny of a federal law enforcement agency.

98.     On April 30, 2010, at about 11 p.m., Plaintiff Fr. Manship was driving east on Main Street in East Haven, on his way to the local Stop & Shop, when defendant Spaulding spotted him. Spaulding made a u-turn and followed Fr. Manship, at a distance of less than a car length, into the Stop & Shop parking lot.

99.     Spaulding then parked his police vehicle in the fire lane near the store entrance and waited for Fr. Manship to approach on his way into the store. When Fr. Manship was passing Spaulding's vehicle, Spaulding stopped him.

100.    Spaulding then proceeded to question Fr. Manship about the ongoing Department of Justice investigation and Fr. Manship's participation in it. In the course of the exchange,

Spaulding accused Fr. Manship of telling half-truths and claimed that others had lied. "This investigation," Spaulding said, "is going nowhere."

101.    By telling Fr. Manship that the investigation would fail, and by detaining and interrogating him, defendant Spaulding intended to intimidate Fr. Manship, discourage him from participating as a witness in the Department of Justice investigation, and deter him from opposing and encouraging others to oppose the defendants' misconduct.

102.    As a result of being detained and retaliated against for exercising his constitutionally-protected First Amendment rights, Fr. Manship has suffered harm and emotional distress.

## THE TOWN AND THE DEPARTMENT'S ILLEGAL POLICIES, PRACTICES, AND CUSTOMS

103.    The Town, the Department, and Defendant Gallo have developed and maintained policies, practices, and customs evincing deliberate indifference to the constitutional rights of persons in East Haven, and these unlawful policies, practices, and customs caused the violations of Plaintiffs' rights described above. They include the following.

104.    It was the policy and/or custom of the Town and the Department not to adequately supervise and train police officers, including the defendant officers, thereby encouraging them to violate the rights of the plaintiffs and others.

105.    Chief Gallo, the Department, and the Town did not require appropriate in-service training or retraining of officers who were known to have engaged in police misconduct.

106.    It was the policy and custom of Chief Gallo, the Department, and the Town to conduct inadequate investigations of civilian complaints, discourage the filing of complaints, and

conclude that officers had behaved appropriately despite compelling evidence to the contrary.

107.    A long list of other policy deficiencies combined to encourage the unlawful conduct of individual defendants described above.  Among the deficiencies identified by the United States Department of Justice are the following:

a.    Outdated written policies and procedures: a significant number of the Police Department's policies are outdated and not consistent with contemporary legal standards and police practices. The Police Department also lacks updated rules of conduct, which set forth specific prohibitions on officer actions and the affirmative requirements that officers must follow.

b.    Insufficient guidance on the application of force: the Police Department does not have clear policies and other written guidance on the application of force by its officers. For instance, it has no comprehensive policy that incorporates all force implements that are available to officers and that delineates the factors that should be considered in determining appropriate levels of force.

c.    Lack of formal requirements for reporting and reviewing use of force: the Police Department apparently does not require its officers to thoroughly report all uses of force to provide for adequate supervisory review.  In addition, it does not conduct comprehensive administrative reviews of critical incidents, such as firearm discharges by officers, to identify necessary corrective action, both disciplinary and non-disciplinary, to prevent or minimize unlawful or improper use of force by officers.

d.    Inadequate citizen complaint and internal investigation processes: the Police Department's policies and practices do not provide for the effective resolution of citizen complaints and internal investigations.  Citizen complaint processes, including complaint forms,

19

are not readily accessible to the public, including individuals with limited English proficiency; there are no objective guidelines concerning the initiation of thorough and timely internal investigations; the department requires notarized statements and limited forms of identification, which discourages some individuals from reporting police misconduct; and current procedures apparently do not require that investigators issue findings and recommendations in all internal investigations.

        e.    Lack of an early identification or warning system: the Police Department does not have a uniform and integrated system that allows supervisors to proactively detect potential patterns of at-risk conduct by officers.

        f.    Fragmented community engagement: the Police Department does not engage all of the communities it serves on policing priorities and collaborative approaches to law enforcement.  Nor has it developed any formal or written guidance on requesting language assistance, initiating immigration status inquiries, or requiring identification from individuals, failures that impede the full participation of members of the East Haven community in the Police Department's policing efforts. This lack of written policies and internal mechanisms to ensure adherence to such policies encourages unlawful conduct like that described in this complaint.

        g.    Limited training: the Police Department's failure to re-train existing officers leaves them without guidance or leadership necessary to deter unlawful conduct like that described in this complaint.

    108.    As a result of the policies and/or customs of Chief Gallo, the Town and the Police Department, including but not limited to those mentioned above, the other individual defendants expected that their actions would not be properly monitored by supervisory officers and that

misconduct would be tolerated and encouraged, and this belief was a substantial factor causing their unlawful conduct.

## CLAIMS

109.    The allegations of paragraphs 1-108 are incorporated into the allegations of each claim below the same as if fully set forth therein.

### First Claim: Equal Protection Violations

110.    Defendants, acting under color of law and in concert with one another, engaged, and continue to engage, in profiling and discriminatory treatment of Plaintiffs and other Latino individuals based on  the race and ethnicity of Plaintiffs (or, in the case of Fr. Manship, his support of persons of this race and ethnicity), and for that reason violated the rights of Plaintiffs to the equal protection of the laws, guaranteed  by the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, and Article First, Section Twenty of the Connecticut Constitution.

### Second Claim: Conspiracy to Commit Equal Protection Violations

111.    Defendants by their conduct described above conspired for the purpose of depriving Latinos and those who supported them, including Plaintiffs, of the equal protection of the laws.

112.    Defendants' conspiracy was motivated by, and Defendants acted with, race-based invidious discriminatory animus.

113.    Defendants engaged in all of the overt acts alleged in this complaint in furtherance of the conspiracy.

114.    The overt acts engaged in by Defendants are evidence of an agreement among them, and they were related to the promotion of the conspiracy.

115.    The conspiracy violated the rights of Plaintiffs to the equal protection of the laws protected by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1985(3) and was an unlawful conspiracy under Connecticut law.

### Third Claim: Neglect to Prevent Wrongs

116.    Defendants had knowledge that the wrongs conspired to be done were about to be committed by other defendants and other employees of the Department.

117.    Defendants had the power to prevent or aid in preventing the commission of the wrongs.

118.    Defendants neglected or refused to prevent or aid in the preventing of the wrongs.

119.    The wrongful acts were committed.

120.    As a result, Plaintiffs suffered violation of their equal protection rights under the Fourteenth Amendment to the United States Constitution, and all of the other harms, damages and injuries described in this complaint.

121.    Defendants' conduct violated Plaintiffs' rights under 42 U.S.C. §§ 1983 and 1986.

### Fourth Claim: Violations of Speech and Petition Rights

122.    The retaliatory conduct of Defendants Cari, Spaulding, Does 1-3, Zullo and Conyers described above violated the rights of plaintiffs Manship, Chacón, Matute and Torres to freedom of speech and to petition their government for redress protected by the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and Article First, Section Four of the Connecticut Constitution.

### Fifth Claim: Conspiracy to Obstruct Justice

123.    Defendants Cari, Spaulding, and Does 1-3 conspired for the purpose of impeding,

22

hindering, obstructing, and defeating the due course of justice, with the intent to injure Fr.

Manship for his attempt to enforce the rights of Latinos to the equal protection of the laws.

124.    Defendants engaged in all of the overt acts alleged in paragraphs 18-34, 36, and 38,

above, in furtherance of the conspiracy.

125.    The overt acts engaged in by Defendants are evidence of an agreement among

them, and they were related to the promotion of the conspiracy.

126.    The conspiracy violated the rights of plaintiff Manship protected by 42 U.S.C.

§ 1985(2).

### Sixth Claim: Illegal Search and Seizure

127.    The conduct of Defendants Spaulding, Cari, Zullo, and Does 1-3 described in

paragraphs 18-34, 36, and 43-49, above, violated the rights of Plaintiffs Chacón, Matute,

Manship, and Aguayza not to be subjected to illegal search or seizure provided by the Fourth and

Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and Article First,

Sections Seven and Nine of the Connecticut Constitution.

### Seventh Claim: Due Process Excessive Force Violations

128.    The conduct of Defendants was objectively unreasonable and violated the rights of

Plaintiffs Albarracín, Criollo, García, and Torres, all Connecticut residents, not to be subjected to

excessive force protected by the Fourth and Fourteenth Amendments to the United States

Constitution, 42 U.S.C. § 1983, and Article First, Sections Seven and Nine of the Connecticut

Constitution.

### Eighth Claim: Due Process Deliberate Indifference Violations

129.    Defendants Spaulding, Does 4-10, Ferrara, Conyers, Olson, Sorbo, Montagna, and

Lennon recklessly or intentionally failed to stop the use of excessive force against Plaintiffs Albarracín, Criollo, Torres, and García.  Defendants Doe 5-10 recklessly or intentionally denied access to medical care to Plaintiff Albarracín.  Defendants' actions constituted deliberate indifference to plaintiffs' rights protected by the Fourth and Fourteenth Amendments of the United States Constitution, 42 U.S.C. § 1983, and Article First, Sections Seven and Nine of the Connecticut Constitution.

### Ninth Claim: Assault and Battery

130.    The assaults by Doe 5, Zullo, Spaulding, and Conyers towards Plaintiffs Albarracín, Criollo, García, and Torres described above put Plaintiffs in reasonable fear of imminent bodily harm and resulted in such harm, and therefore constituted unlawful assault and battery under the laws of the State of Connecticut.

### Tenth Claim: Intentional Infliction of Emotional Distress

131.    The conduct of Defendants Cari, Spaulding, Does 1-10, Ferrara, Conyers, Olson, Zullo, Sorbo, Montagna, and Lennon towards all Plaintiffs described above constituted intentional infliction of emotional distress under the laws of the State of Connecticut because Defendants knew or should have known that emotional distress was the likely result of that conduct, the conduct was extreme and outrageous, and the conduct caused severe emotional distress to Plaintiffs.

### Eleventh Claim: Negligent Infliction of Emotional Distress

132.    The conduct of Defendants Cari, Spaulding, Does 1-10, Ferrara, Conyers, Olson, Zullo, Sorbo, Montagna, and Lennon towards all Plaintiffs described above constituted negligent infliction of emotional distress under the laws of the State of Connecticut because Defendants

should have realized that such conduct involved an unreasonable risk of causing illness or bodily injury and such conduct caused emotional distress to Plaintiffs.

### Twelfth Claim: False Arrest and Malicious Prosecution

133.    The conduct of Defendants Spaulding, Cari, and Does 1-3, toward plaintiff Manship described above constituted false arrest and malicious prosecution under the laws of the state of Connecticut because Defendants arrested Plaintiff without probable cause and for an improper purpose.

### Thirteenth Claim: Tortious Interference With Business Relation

134.    The conduct of defendants Spaulding, Cari, and Does 1-3 toward plaintiffs Matute and Chacón described above was malicious, involved intimidation and misrepresentation, and interfered with the business relations of the plaintiffs with their customers, to their loss.

### Fourteenth Claim: Supervisory Liability

135.    Defendant Gallo knew that members of the Department were violating the equal protection rights of Latinos, including Plaintiffs. Defendant Gallo could have taken action to investigate, address, and prevent violations of the plaintiffs' rights, but he knowingly and deliberately failed and refused to do.

136.    As a result of defendant Gallo's knowing and deliberate failure to investigate, address, prevent, or punish discrimination, such conduct became an accepted custom and practice in the Department.

137.    By his acts and omissions, defendant Gallo knowingly and intentionally disregarded repeated, pervasive, and ongoing violations of the rights of Latinos and knowingly and intentionally failed to protect Latino members of the public, thus subjecting them, including

25

Plaintiffs, to violation of their rights to equal protection under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §§ 1983 and 1986.

## Fifteenth Claim: Municipal (*Monell*) Liability

138.    The policies and customs promulgated by the Town described above demonstrated deliberate indifference to the constitutional rights of all plaintiffs and caused the violations of Plaintiffs' rights described above, in violation of Plaintiffs' rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983, 1985(3), and 1986.

## Sixteenth Claim: Muncipal Liability Pursuant to Conn. Gen. Stats. Section 7-465

139.    On or about July 21, 2009, plaintiffs Albarracín, Criollo and Espinoza, served notice on the Town Clerk of the Town pursuant to Conn. Gen. Stat. § 7-465 of their intention to commence this action.  Pursuant to that statute, the Town is liable for the negligence or violations of these plaintiffs' civil rights by the individual defendants, insofar as those violations are found, as to the individual defendant concerned,  not to be the product of any wilful or wanton act by the defendant.

## Seventeenth Claim: Title VI violation

140.    Through the conduct described above, defendant East Haven Police Department, a program or activity that receives federal funding, has violated plaintiffs' rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq.* by utilizing policies and methods which intentionally discriminate against Plaintiffs based on their race, color, and/or ethnicity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request a jury trial, pursuant to Fed. R. Civ. P. 38, and request the following relief:

1.   Compensatory damages;

2.   Punitive damages;

3.   Costs, including reasonable attorney's fees;

4.   Injunctive relief adequate to prevent the continuation and recurrence of the defendants' unlawful conduct; and

5.   Such other and further relief as the Court deems just.

THE PLAINTIFFS


By_____

David N. Rosen (ct00196)
James Bhandary-Alexander (ct28135)
400 Orange Street
New Haven, Connecticut 06511
(203) 787-3513

Michael Wishnie (ct27221)
Susan Hazeldean (ct28403)
Manuel Giner, Law Student Intern
Tafari Lumumba, Law Student Intern
Dermot Lynch, Law Student Intern
Yaman Salahi, Law Student Intern
Jerome N. Frank Legal Services Organization
Yale Law School
P.O. Box 209090
New Haven, CT 06520
(203) 432-4800
Their Attorneys